FILED
 2012 Aug-14  AM 09:14
U.S. DISTRICT COURT
    N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GEORGE WILSON AND EDNA WILSON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CV-10-BE-3254-S |
| | ) |
| KIDDE PRODUCTS LIMITED, a corporation; et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This products liability case comes before the court on "Defendant's Motion for Summary Judgment" (doc. 44); "Defendant's Motion to Exclude the Testimony of Plaintiffs' Expert Witnesses" (doc. 47); and "Defendant's Motion to Strike the [Evidence] Submitted by Plaintiffs in Response to Defendant's Motion for Summary Judgment" (doc. 58). These motions have received thorough briefing. For the reasons stated in this Memorandum Opinion, the court will DEFER RULING on the motion to exclude, will DENY the motion to strike, and will DENY the motion for summary judgment.

### I. PROCEDURAL HISTORY

The Plaintiffs originally filed this suit in state court, and the Defendants removed it to this court on November 24, 2010. The Complaint contains three counts: Count I, asserting a claim under the Alabama Extended Manufacturer's Liability Doctrine based upon the alleged design,

1

manufacture, selling or distribution of a five-way water distribution manifold or portable hydrant that was allegedly defective and unreasonably dangerous when used in the foreseeable manner; Count II alleges that Defendants breached the warranty of merchantability as merchants and sellers of the five-way manifold in question; Count III alleges that Defendants were negligent in selling or distributing the defective and unreasonably dangerous five-way manifold; and Count IV is Edna Wilson's claim for loss of services and consortium. After a number of Defendants have been dismissed, the case now proceeds as to the only remaining Defendant, Kidde Fire Fighting, Inc. (Order dated November 24, 2012 & Doc. 7).

The Defendants have filed three motions that remain pending: a motion for summary judgment as to all remaining claims; a motion to exclude the testimony of Plaintiffs' experts Talbot and Marhefka (doc. 47), and a second motion to strike (doc. 58) addressing not only the testimony of experts Talbot and Marhefka but also other evidence offered in opposition to the motion for summary judgment.

## II. FACTS

George Wilson, one of the two Plaintiffs, was employed by the Birmingham Fire & Rescue Service ("BFRS") as an apparatus operator. On June 21, 2008, he took part in and was injured during a training exercise that the BFRS conducted. Three separate engine companies from the BFRS took part in the training exercise that day. The purpose of the exercise was to train firefighters to use a portable hydrant, or a separate piece of equipment called a hydrant assist, or both pieces of equipment. The hydrant assist connects directly to the fire hydrant and allows for boosting of water pressure when hydrant pressure is low. The portable hydrant allows for water flowing into it from one source at the inlet to be distributed to up to five different

outlets on the downstream side. Hoses can be connected to each of those five outlets on the portable hydrant, and each of five outlets has a valve. The portable hydrant used the day of the accident was identified as an Angus five-way manifold hydrant that Kidde's predecessor manufactured or sold to the BFRS.

The training exercise also involved a fire truck and hose sections measuring five inches in diameter. As part of the exercise, the firefighters would connect the appliances and make sure those participating knew how to connect and operate them. After the engine companies arrived at the scene, the members of the companies held a general discussion focused on the procedure for conducting the training exercise and which firefighter would be responsible for performing which tasks.

During the exercise, a firefighter connected the hydrant assist directly to the fire hydrant located at the training site and one five-inch hose was connected from the hydrant assist to Engine 16. A second five-inch hose connected Engine 16 to the intake valve on the hydrant assist. A third five-inch hose connected the hydrant assist directly to the portable hydrant. At the beginning of the exercise, all the valves on the portable hydrant were closed. After those hoses were connected as described, the system was charged with water. No hoses were connected to any of the downstream discharge outlets on the portable hydrant.

Firefighter Joseph Smith testified that the pressure relief valve on the portable hydrant was originally set to release at 150 pounds per square inch (psi), and a dispute exists whether the hydrant was adjusted upward to allow for higher system pressure using the hydrant assist. In any event, water was flowing to the portable hydrant at the time of the incident made the basis of this suit. Smith was instructed to open a downstream discharge valve on the portable hydrant, and

when he began opening it, the portable hydrant moved forcefully and struck Plaintiff George Wilson.

Defendant Kidde's predecessor manufactured or sold portable hydrants to the BFRS. Kidde's 30(b)(6) representative acknowledged that when Kidde sells a portable hydrant, it does not know the training or experience of the firefighters who will ultimately use it.

The parties dispute the amount of water pressure at the time of the incident. Firefighter Smith testified that the hydrant assist was activated, boosting the water pressure coming off the engine so that it had climbed to approximately 200 psi at the time of the accident. As 200 psi is the pressure limit for the five-inch hose that the BFRS uses, that pressure represents a dangerous amount of pressure, exceeding the normal setting for the relief valve on the portable hydrant. However, according to firefighter Roderick Gwin, the engine operator, no water was in the engine's pump yet to boost the water pressure at the time of the accident. Firefighter Melvin Brown agreed that no water was going to the engine pump to boost the water pressure at that point. Further, firefighter Demetrius Webb also testified that the firefighters had not done anything to boost the pressure at the time of the accident and the "pop-off valve" that was supposed to pop at high pressure had not popped at the time of the accident. (Webb Depo., Doc. 46-4, at 7 p. 27). Other firefighters testified that they cannot recall anyone adjusting the portable hydrant's pressure relief valve higher than the normal setting of 150 psi at the training exercise. Therefore, a dispute exists whether the water pressure had indeed been increased and whether the water pressure was at 200 psi when the accident occurred.

A dispute also exists among the parties regarding whether the firefighters present at the accident were aware of the danger presented by using the portable hydrant under the

circumstances present.  Tim Love, Battalion Chief with the BFRS, testified that he was aware of the danger presented by using a portable hydrant with highly pressurized water, but, as noted, the amount of water pressure operating at the time of the accident is in dispute.  However, many of the firefighters present at the accident testified that, prior to the accident, they had never heard of portable hydrants becoming airborne or otherwise behaving the way that the portable hydrant did at the time of the accident.

     A dispute exists about the BFRS's uses of the portable hydrant.  Chief Love testified that "[t]here is no practical or foreseeable use of the portable hydrant without at least two hoses attached to the discharge outlet," and that BFRS firefighters would not train with equipment in a different manner than they would use it in an actual fire response. (Love. Aff., Doc. 46-10 ¶¶ 2&5).  He also testified that the BFRS does not use the portable hydrant as an end of the line device.  However, firefighter Williams testified that the firefighters can use the portable hydrant as an "end line shut off" and he also testified that the BFRS has no protocol about ensuring that downstream hoses are attached to the portable hydrant. (Williams Depo., Doc. 46-14, at 12, pp. 47-48). In addition, firefighter Jerry Cox testified that the firefighters use the portable hydrant as a safety device to regulate high pressure, because the portable hydrant has a water pressure "relief valve pointing downstream of the hose line" that should release at water pressure over 150 psi. (Cox. Depo., Doc. 46-3, at 6, pp. 21-22).

     The record is not clear whether that dispute about the uses of the portable hydrant exists (a) because the firefighters have a difference of opinion about the ordinary, intended use of the hydrant (i.e., they disagree over whether usage of the portable hydrant as an end-of-line and pressure release device is included in a list of several ordinary, intended uses); or (b) because the

firefighters all acknowledge that the only ordinary, intended use of the portable hydrant is with hoses attached but they disagree over whether also using it as an end-of-the-line and/or pressure relief device is a foreseeable use/misuse.

*Expert Testimony*

Wilson presents the testimony and opinions of two experts, as further discussed below. Those experts opine that the portable hydrant as it was manufactured and sold was unreasonably dangerous and the accident was caused by its designer and manufacturer's failure to incorporate proper warnings. As stated previously, Chief Love testified that no warnings were necessary to advise the BFRS firefighters of the danger of using the portable hydrant the way it was used at the time of the accident because the BFRS knew of those risks.

### III.  NON-DISPOSITIVE MOTIONS

Defendant has filed two non-dispositive motions, a motion to exclude expert testimony and a motion to strike.

### A.  Motion to Exclude Expert Testimony

Plaintiffs allege that the Defendant Kidde failed to provide proper warnings concerning the portable hydrant. To support that allegation, they offer the testimony and opinions of two "experts." Thomas Talbot opined that "the portable hydrant, as manufactured and sold, was unreasonably dangerous because there were no warning labels addressing the consequence of opening the discharge valves without first properly attaching discharge fire hoses." He further opined that the "accident was a result of the designer and manufacturer of the equipment failing to incorporate proper warnings which would warn the user of the potential dangers of improperly connecting and using the portable hydrant." (Talbot rept., Doc. 53-4).

"Expert" Russell Marhehefka opined that "the Total Safety Communication System associated with the Style 51 portable hydrant in question was inadequate. . . A firefighter of reasonably normal physical and cognitive skills, including Mr. Wilson, would not be aware of the existence/magnitude of the uncontrolled whipping hazard presented by the Style 51 portable hydrant-fire hose in question ....  Consequently, the portable hydrant in question, with no warnings affixed to it, was unreasonably dangerous because of the potential hazard associated with it's [sic] use, the existence and magnitude of which was unknown by Mr. Wilson." (Marhefka rept., Doc. 53-2, at 2 ¶ 2, 3 ¶¶ 4 & 8 ).  Further, he opined that Kidde knew or should have known of the danger and that its failure to "provide appropriate warning, instructional or training material on and/or with the [] portable hydrant in question" was the producing cause of Mr. Wilson's accident. *Id.* ¶¶ 6 & 10.

Defendant argues that the court should exclude the testimony of Talbot and Marhefka for three reasons: (1) neither is qualified to offer opinion testimony about the portable hydrant; (2) neither has employed a reliable methodology in developing his opinion or otherwise offered adequate support for that opinion; and (3) both offer nothing more than *ipse dixit*[1] to support their opinions.

As the court will discuss subsequently, numerous issues of fact exist in this case.  The court need not rule on the admissibility of the opinions and testimonies of those experts to rule on the motion for summary judgment.  Therefore, the court DEFERS ruling on the motion to exclude at this point, and will address it at a later hearing before trial.

---

[1]Latin meaning "he himself said it," and defined as "something asserted but not proved." Black's Law Dictionary 833 (7th ed. 1999).

### B.  Defendant's Motion to Strike Evidence

Defendant also moves to strike the following evidence that the Wilsons offered in opposition to the motion for summary judgment: (1) expert report of Marhefka (doc. 55-2); (2) expert report of Talbot (doc. 55-4); (3) deposition testimony of Marhefka (doc. 55-5, adopting and incorporating Def.'s doc. 46-9); (4) deposition testimony of Talbot (doc. 55-6 adopting and incorporating Def.'s doc. 46-8) ; (5) deposition testimony of Raymond Williams (doc. 55-8 adopting and incorporating Def.'s doc.46-14); (6) deposition testimony of Jerry Cox (doc. 55-9 adopting and incorporating Def.'s doc. 46-3); (7) deposition testimony of Roderick Gwin ( doc. 55-10 adopting and incorporating Def.'s doc. 46-13); (8) deposition testimony of  Demetrius Webb (doc. 55-11, adopting and incorporating Def.'s doc. 46-4); deposition testimony of George Wilson (doc. 55-12, adopting and incorporating Def.'s doc. 46-2); deposition testimony of Melvin Brown (doc. 55-13 adopting and incorporating Def.'s doc. 46-12); deposition testimony of Jerry Shepherd (doc. 55-14 adopting and incorporating Def.'s doc. 46-7); deposition testimony of Joseph Smith (doc. 55-15, adopting and incorporating Def.'s doc. 46-6).

As to the reports and testimonies of Marhefka and Talbot, the court sees nothing in the motion to strike that is not addressed in the motion to exclude or covered by that motion. Consequently, the court DENIES as redundant the motion to strike to the extent that it refers to the expert reports and testimonies. The court will address the admissibility of the experts' testimony in a later hearing before trial.

As to the testimony of the other individuals, Kidde's motion to strike lumps them together and asserts very generally that the testimony is "irrelevant and immaterial to the issues

raised in Kidde's motion inasmuch as these deposition excerpts do not address the knowledge of the BFRS or the misuse of the portable hydrant." (Doc. 58, at 3).  Kidde provides no citations to objectionable parts of the depositions, but asks the court to strike the entire deposition testimony of each person listed.   The court DENIES the motion as it applies to this testimony.  The depositions identified in the motion contain relevant and material information, and Kidde itself relies on this material in support of its motion.  Thus, the court will not strike the depositions *in toto,* as requested.

In sum, the court DENIES the motion to strike.

### III.  MOTION FOR SUMMARY JUDGMENT

As noted previously, the Complaint contains four counts asserting claims for violation of the AEMLD, breach of warranty, negligence, and loss of consortium.  Kidde's motion for summary judgment addresses each of these claims.

### A.  Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* If the moving party does not meet its burden, the court must deny the motion for summary judgment.

### B. Analysis of Claims

#### 1. AEMLD and Negligence

Kidde argues that it is entitled to summary judgment on the AEMLD and negligence claims based on "failure to warn" theories of liability. It asserts that the BFRS was aware of the danger presented by operating the portable hydrant *as it was operated at the time of the accident*, and Kidde had no duty to warn the BFRS and its firefighters about dangers of which the BFRS was already aware.

To establish a *prima facie* case based upon a violation of the AEMLD, a plaintiff must prove that

> he suffered injury or damages to himself or his property by one who [sold] a product in a defective condition unreasonably dangerous to the plaintiff, as the ultimate user or consumer, if (a) the seller [was] engaged in the business of selling such a product, and (b) it [was] expected to and [did] reach the user or consumer without substantial change in the condition in which it [was] sold.

*Morguson v. 3M Co.,* 857 So. 2d 795, 800 (Ala. 2003) (quoting *Casrell v. Altec Indus., Inc.,* 335 So. 2d 128, 132-33 (Ala. 1976)). In determining whether a product is unreasonably dangerous to

the user or consumer, the court reads that component "to include the concept of the plaintiff's awareness of the danger of the product." *Ex parte Chevron Chemical Co.,* 720 So. 2d 922, 928-29 (Ala. 1998). The Supreme Court of Alabama has stated that the user's awareness of a product's danger is a "complete affirmative defense" under the AEMLD. *Id.*; *Atkins v. Am. Motors Corp.,* 335 So. 2d 134, 143 (Ala. 1976); *Entrekin v. Atlantic Richfield Co.,* 519 So. 2d 447, 450 n. 5 (Ala. 1987).

As to the negligent failure to warn claim in Count III, a plaintiff establishes his *prima facie* case by providing evidence (1) that the defendant had a duty to warn about dangers associated with a particular product; (2) that the defendant breached that duty by failing to provide adequate warnings; (3) that the plaintiff suffered an injury; and (4) that the breach was the proximate cause of the plaintiff's injury. *See Toole v. Baxter Healthcare Corp.,* 235 F.3d 1307, 1315 (11th Cir. 2000) (affirming a comparable charge on negligent failure to warn under Alabama law); *see also E.R. Squibb & Sons, Inc. v. Cox,* 477 So. 2d 963, 969 & n. 3 (Ala. 1985*)* (stating "[t]he elements of plaintiff's *prima facie* case of products liability negligence are identical in number and nature to those that compose a plaintiff's *prima facie* case of negligence in any other area of the law). The Supreme Court of Alabama has explained that the "duty to warn end users of the dangers of products arises, in a pure negligence context, from § 388, Restatement (Second) of Torts, as adopted by [that] Court." *Ex parte Chevron Chemical Co.,* 720 So. 2d 922, 924 (Ala. 1998) (citing *Purvis v. PPG Inds., Inc.,* 502 So. 2d 714, 719 (Ala. 1987)). The Alabama Supreme Court has "held that the duty to warn contemplated by § 388(c) is triggered only when the supplier has 'no reason to believe' that the user will realize the 'dangerous condition' of the product referred to in § 388(c)." *Ex parte Chevron*, 720 So. 2d at

11

925 (quoting *Gurley v. Am. Honda Motor Co.,* 505 So. 2d 358, 361 (Ala. 1987)).

In the instant case, the purchaser of the hydrant was the BFRS, George Wilson's employer. Alabama law provides that the manufacturer/distributer has no duty to provide an employer or its employees "with a warning of a danger of which they already were, or had reason to be aware." *Ex parte Chevron*, 720 F. 2d at 926. When an employer is aware of a workplace danger, it has an obligation to inform its employees. *See* Ala. Code § 25-5-1 (1975) (requiring employers to provide employees with a safe place to work). Alabama law provides that manufacturers/distributors are entitled to rely on a third party, such as an employer, to warn the ultimate user, such as employees, of known workplace dangers where that third party has an independent duty to do so. *Ex parte Chevron*, 720 So. 2d at 926 & n. 2 (finding that the manufacturer was entitled to summary judgment on failure to warn claims under the AEMLD and for negligence where it provided a warning to the employer and where the employer "had a duty to warn its employees of known workplace dangers"); *Vines v. Beloit Corp.,* 631 So. 2d 1003, 1006 (Ala. 1994) (affirming summary judgment for manufacturer on failure-to-warn claims based on violation of the AEMLD and negligence when the manufacturer provided warnings to the plaintiff's employer, a sophisticated user of equipment, regarding the risk plaintiff incurred).

In the instant case, Kidde has not provided evidence that it warned BFRS, George Wilson's employer. It has, however, provided evidence that the BFRS was aware of at least some risks of using the portable hydrant. Chief Love of the BFRS testified that the BFRS "knew the risks presented by using the portable hydrant in th[e] manner [that it was used at the time of the accident]." (Doc. 46-10 ¶ 7). However, Love does not state that he was present at the

accident. His testimony that BFRS was aware of the dangers posed assumes one scenario of the facts surrounding the accident where those facts are disputed and more than one scenario exists. For example, Love's testimony is that he understands, presumably based upon the information provided to him, that the pressure of the water flowing through the portable hydrant was approximately 200 psi at the time of the accident. That fact is disputed. At least one firefighter present at the accident sets the water pressure at 200 psi, but several firefighters who were at the scene testified that the water pressure remained at 150 psi or below and would not have been at highly charged and dangerous levels. Because a factual dispute exists about whether the water pressure was at extremely high levels, Love's testimony that BFRS and its firefighters were aware of the risk presented by using the portable hydrant *with water at such high levels* does not prove that BFRS and its firefighters were aware of the risk presented by using the portable hydrant with water pressured at levels of approximately 150 psi and below. Therefore, given the dispute of fact, Love's testimony would not require the entry of summary judgment on the duty to warn claims.

  Further, Love testified that the BFRS does not use the portable hydrant as an end of the line device, but instead, that the only foreseeable or practical use of the portable hydrant is to attach at least two hoses to the discharge outlets. Given that the BFRS would not use the portable hydrant without at least two hoses attached, Love stated that no warnings were necessary to warn firefighters about doing so. However, firefighter Williams testified that the BFRS did use the portable hydrant as an end of the line device, and, of course, the firefighters used it in this instance without hoses attached. Similarly, firefighter Cox testified that the BFRS used the portable hydrant as a safety device because it had a water pressure relief valve that released when

the water pressure climbed over 150 pounds per inch. Again, a dispute exists about the facts surrounding the BFRS's use of the portable hydrant. Kidde's argument ignores the factual disputes.

Similarly, because firefighters' testimony varied about whether the portable hydrant could be and was used as an end-of-the-line device and/or a pressure relief device, and because Kidde has not established that its only ordinary use was with hoses attached, Kidde has not established product misuse as a matter of law and has not established that any misuse was unforeseeable.

In light of those disputes of fact, the court finds that Kidde has not established its entitlement to summary judgment on the AEMLD and negligence claims; thus, the motion for summary judgment is due to be DENIED as to the AEMLD and negligence claims in Counts I and III, respectively.

### 2. Warranty of Merchantability

In Count II of his Complaint, Wilson asserts a claim for breach of the implied warranty of merchantability. Alabama law provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Ala. Code § 7–2-314 (1975). "Merchantability" within the meaning of that code section refers to the product's "fit[ness] for the ordinary purpose for which such goods are used." *Id.* To establish a *prima facie* case for breach of the implied warranty of merchantability, a plaintiff must prove the following elements: "the existence of the implied warranty, a breach of that warranty; and damages proximately resulting from that breach." *Barrington Corp. v. Patrick Lumber Co.,* 447 So. 2d 785, 787 (Ala. Civ. App. 1984).

Kidde argues that no basis for a claim of breach of warranty exists where the product is fit

for the task for which it was purchased but where the Plaintiff alleges that the product nevertheless contains inherent dangers and is unreasonably dangerous. In support of that argument, it cites an unpublished Eleventh Circuit case addressing Alabama law, *Bodie v. Purdue Pharma Co.,* 236 Fed. Appx 511 (11th Cir. 2007).

Because *Bodie* is not controlling authority,[2] the court looks to other case law to determine whether the breach of warranty claim is viable. In *Shell v. Union Oil Co.,* 489 So. 2d 569, 571 (Ala. 1986), for example, the Alabama Supreme Court addressed whether breach of implied warranty claims are subsumed into AEMLD claims. It found that breach of warranty claims are subsumed and not separately viable where the evidence reflects that the product is fit for its intended purpose, even though it contains inherent dangers, and where no evidence exists of non-merchantability except a general allegation that the product has those inherent dangers.

In the *Shell* case, the plaintiff, an employee of a buyer of a cancer-causing chemical compound that was made to buyer's specifications brought an action against two suppliers of that compound. He alleged, among other things, that because the compound caused cancer it was unreasonably dangerous and could not be merchantable. The plaintiff could not otherwise claim that the product was not fit for its intended purpose because the compound was produced based on buyer specifications, including specifying the amount of the carcinogenic ingredient. Pointing out the distinction between tort law, which focuses on standards of safety, and U.C.C. law, which focuses on "standards of quality of a product, with the attendant risk of the bargain," the Alabama Supreme Court concluded that "[w]hether this product was unreasonably dangerous,

---

[2] Unpublished opinions such as *Bodie* "are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.,* 487 F.3d 1340, 1345 n. 7 (11th Cir. 2007).

therefore, is not a question properly addressed in an action brought under the provisions of the U.C.C," but instead, should be raised in a claim for violation of the AEMLD. *Id.* at 571.  Thus, the Court allowed no separate claim for breach of warranty where the dangerous chemical compound was fit for its intended purpose.

However, where a jury question exists regarding whether the product was fit for its intended purpose, courts applying Alabama law have found that claims brought under the AEMLD and for breach of implied warranty *both* remain viable.  For example, in *Spain v. Brown & Williamson Tobacco Corp.,* 872 So. 2d 101 (Ala. 2003), the Alabama Supreme Court, in response to certified questions from the Eleventh Circuit, stated that the AEMLD did not preclude a claim based on the implied warranty of merchantability under the UCC where the administrator of a deceased cigarette smoker's estate brought a products liability action against cigarette manufacturers, alleging negligence, breach of warranty and violation of the AEMLD.  Discussing *Shell*, the Alabama Supreme Court emphasized that the chemical product in *Shell* was fit for the ordinary purpose for which it was used.  It stated, however, that "*Shell* does not stand for the proposition that a product 'unfit for the ordinary purposes for which such goods are used' cannot be unmerchantable." 872 So. 2d at 108.  The Alabama Supreme Court distinguished the *Spain* case from *Shell* because the complaint in *Spain* alleged that the cigarettes were not fit for the ordinary purposes for which they were used.  Noting that the case was before the Eleventh Circuit on a motion to dismiss, and "the record does not contain any evidence indicating that the cigarettes ... *were* 'fit for the ordinary purposes for which they are used,'" the Court found the case, at that early stage, to be factually distinguishable from *Shell*.  *Id.* at 108-09.  The Supreme Court of Alabama's ultimate response to the certified question was that "a claim alleging breach

of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product." 872 So. 2d at 111.

*Allen v. Delchamps, Inc.,* 624 So. 2d 1065 (Ala. 1993) represents another case in which claims of unreasonably dangerous products were allowed to proceed under both theories of breach of implied warranty of merchantability and violation of AELMD.  In this case, the Supreme Court of Alabama reversed a grant of summary judgment where a plaintiff, who went into anaphylactic shock after eating celery, asserted claims of violation of AEMLD, and breach of implied warranty of merchantability, among others.  The Court found that the standards of proof for the AEMLD (whether the product was unreasonably dangerous) and for the warranty of merchantability (whether the goods were unfit for the ordinary purposes for which they were used) went "'hand in hand,' at least as applied to food products, 'for it is apparent that a food product is defective or unreasonably dangerous if it is unmerchantable.'" *Id.* at 1068.  The *Allen* case confirms that *where evidence exists that the product was not fit for its intended purpose* – in *Allen*, the intended purpose was eating – the implied warranty of merchantability is not subsumed by the AEMLD claim, both remain viable, and summary judgment is improper.

With that discussion of Alabama law in mind, in determining whether the breach of warranty claim is subsumed within the AEMLD claim in the instant case, the crucial question is whether evidence exists that the portable hydrant is not fit for its intended purpose. The *Shell* case established that where the evidence reflects that the product is fit for its intended purpose, even though it contains inherent dangers, the breach of warranty claim is subsumed and is not viable.  However, under *Allen*, if evidence exists that the product was *not* fit for its intended purpose, then the breach of warranty claim is viable separate and apart from the AEMLD claim.

17

Predictably, Kidde argues that the evidence reflects the hydrant is indeed fit for its intended purpose, which it characterizes as distribution of water to multiple outlets, and thus, that summary judgment is due on the breach of warranty claim. Wilson, on the other hand, argues that the portable hydrant's intended purpose was to distribute water while remaining on the ground, which it did not do, and thus, the breach of warranty claim should go forward.

The evidence in the instant case contains a lack of clarity over the portable hydrant's ordinary, intended use. In any event, disputes exist over how the BFRS used it. Kidde's undisputed fact number 3, which Wilson admitted, states that "[t]he portable hydrant allows for water flowing into it from one source to be distributed to up to five different outlets allowing up to five hoses to be connected to one water source." (Doc. 45 ¶ 3). However, the record reflects conflicting evidence about whether the portable hydrant is *also* used as an end of the line device or a pressure-relieving device with its automatic pressure relief valve that should release at water pressure above 150 pressure per inch. Chief Love testified that such other uses would not be practical or foreseeable, but other BFRS firefighters testify that they used the device in those ways. Accordingly, a jury issue exists about what the ordinary purpose(s) of the hydrant was or were, whether the portable hydrant was fit for its intended purpose(s), and whether the alleged breach of any implied warranty caused the harm. The court finds that the motion for summary judgment is due to be DENIED as to the claim asserted in Count II for breach of warranty.

### 3. Loss of Consortium

In light of the determinations above, the court finds that the motion for summary judgment is due to be DENIED as to the claim asserted in Count IV for loss of consortium.

### 4. Conclusion regarding Motion for Summary Judgment

In sum, the court finds Kidde's motion for summary judgment is due to be DENIED. This case will proceed to trial.

Dated this 14th day of August, 2012.

*Karon O. Bowdre*
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE